UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 21-60229-Cr-Ruiz

UNITED STATES OF AMERICA

v.

DAMARA HOLNESS,

     Defendant.

_____/

**GOVERNMENT'S MEMORANDUM REQUESTING THAT THE DEFENDANT BE SENTENCED WITHIN THE SENTENCING GUIDELINE RANGE OF 33-41 MONTHS AND OPPOSITION TO DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE**

     The United States hereby files this memorandum requesting that the be sentenced within the sentencing guideline range of 33-41 months and its opposition to the defendant's motion for downward departure, and states as follows:

I.     **Background of the Case**

     On March 27, 2020, the Coronavirus Aid Relief Economic Security (CARES) Act was enacted to provide emergency financial assistance to the millions of Americans suffering adverse economic effects due to the COVID-19 pandemic. The CARES Act authorized the SBA to provide loans to eligible small businesses experiencing substantial financial disruptions due to the COVID-19 pandemic. One source of relief provided by the CARES Acts was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP. In April 2021, the United States Congress authorized over $300 billion in additional PPP funding.

On June 29, 2020, the defendant submitted an online PPP loan application to Kabbage, Inc. (Kabbage), for a business called Holness Consulting. Kabbage is an online bank that provides funding directly to small businesses and consumers that was an approved SBA lender for PPP loans. The defendant submitted this application as an "eligible self-employed individual" and listed the purpose of the loan as "payroll." The application claimed that the average monthly payroll for the business during 2019 was $120,000, and that the business employed 18 employees. None of it was true. Based upon the average monthly payroll and the number of employees, the defendant requested a PPP loan for $300,000.

This PPP application included a list of eight certifications, each of which the defendant initialed an acknowledgement of understanding. These certifications were including certifications that: (a) "The applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors;" (b) "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant"; and (c) "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the PPP Rule."

In support of this application, the defendant submitted a fraudulent Internal Revenue Service (IRS) Form W-3 to Kabbage. The W-3 falsely reflected that, in 2019, Holness Consulting paid wages of $1,440,000 and withheld the following from these wages: $532,800 in Federal income tax; $178,560 Social Security tax; $41,760 in Medicare tax. None of this was true.

Instead, the investigation revealed that in 2019 Holness Consulting received income of less than $6,000, and it paid wages of less than $2,000. IRS records revealed that the submitted Form W-3 was fraudulent because this company had not filed any W-2 or W-3 forms in 2019. A review of IRS records revealed that, in 2019, there was no record of any federal income tax withholdings for Holness Consulting nor were any quarterly income tax returns, Form 941, filed.

Based upon the information provided by the defendant in this PPP loan application, on July 2, 2020, Kabbage approved the loan and sent, via wire, $300,000 to the defendant's Chase Bank business account.

In order to make it appear that the loan was legitimate, the defendant created a ruse whereby she paid 22 individuals approximately $1,300 every two weeks. A review of Holness Consulting bank records revealed that, after the issuance of the PPP loan proceeds, checks were issued on a bi-weekly basis the checks were endorsed on the rear of the check and were cashed at a Chase Bank. The FBI interviewed several recipients of the checks issued by the defendant. They informed that, in July or August 2020, they were allegedly "hired" by the defendant; however, these individuals informed that they performed little to no work for Holness Consulting. On a bi-weekly basis, these individuals were issued a check for approximately $1,300, which the defendant requested that each employee endorse. After signing their check, the purported "employee" was paid $300, and the defendant retained the remaining balance of approximately $1,000. On several occasions, the defendant traveled with the purported "employee" to Chase Bank to cash the check.

The government has obtained images of 135 checks written by the defendant to the alleged "employees" of Holness Consulting totaling $181, 228.  Seven of those checks were written to the defendant totaling $16,747.24.  Thus, the government estimates that the defendant personally profited from the unlawful scheme by keeping $135,000 in cash and $16,747.24 in checks for a total of $151,747.24.

In spite of receiving approximately $151,000 in compensation from Holness Consulting from July 2020 through September 2020, the defendant also received unemployment benefits, which was unlawful, As set forth in paragraph 66 of the PSI, the defendant received bi-weekly compensation of $370 from June 5, 2020 to August 27, 2021. From May 9, 2020 to June 19, 2021, the defendant received a weekly supplemental payment of $300.  On January 16, 2021, the defendant was issued a payment of $2,405.  On June 24, 2020, the defendant issued a payment of $4,200.  On June 23, 2020, the defendant was issued a payment of $1,295.  Even though the defendant illegally obtained approximately $151,000 in PPP funds and thousands of dollars in unemployment compensation, paragraph 71 of the PSI reflects that the defendant has $2,637 in assets and therefore does not have the present ability to pay a fine or make restitution.   The defendant has never explained what she did with the money she received.

In or about March 2021, the FBI contacted the defendant and set up a meeting with the defendant to discuss the PPP loan.  The defendant failed to show up at the meeting or at a second meeting arranged with the FBI.  The FBI agents then set out to locate the defendant in order to serve the defendant with a federal grand jury subpoena for the records of Holness Consulting.  The agents subsequently served the defendant at shopping mall as she was getting out of a green Tesla she had been driving.

After the defendant was approached by the FBI, she then attempted to obstruct the investigation by contacting witnesses.   As set forth in paragraphs 20, 24, and 28 of the PSI, the defendant contacted at least two purported employees, V.R. and S.R. In these conversations, defendant gave them directions as to information to be provided during their interviews with law enforcement.   The defendant told S.R. to falsely tell the FBI that S.R. earned the money working for a political campaign handing out fliers and making telephone calls.   The defendant informed V.R. that bank investigators might contact him, and she instructed him to falsely tell the investigators that he received all of the money reflected on his Form W-2.  None of it was true. As set forth in paragraph 28 of the PSI, these actions could be construed to be the willful obstruction or impeding of a criminal investigation.

The defendant subsequently obtained counsel and met with the government, along with her client.  The government showed the defendant and her client the evidence against her and the defendant agreed to plead guilty.  At the meeting with the government, defendant's counsel provided the documents in response to the government's federal grand jury subpoena.  It is turning over those documents that the defendant in her motion claims as a basis for a downward departure for cooperating with the government.

On or about November 3, 2021, defendant Holness pled guilty to a one-count Information charging her with Conspiracy to Wire Fraud, in violation of 18 U. S. C. § 1343.  The Presentence Investigation Report reflects a guideline range of 33-41 months' imprisonment. For the reasons set forth below, the government believes that the sentencing guidelines are reasonable, and the defendant should be sentenced to a sentence within the guideline range.

**Sentencing Factors Under 18 U.S.C. § 3553(a)**

Along with considering the advisory guideline range of 33-41 months the Court must consider the factors under 18 U.S.C. § 3553(a) including 1) the nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553(a)(1)); 2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment (18 U.S.C. § 3553(a)(2)(A); 3) to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B)); and 4) to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(1)(C)); and 6)  and the need to avoid sentencing disparities.

**Nature and Circumstances of the Offense**

The defendant incorporated Holness Consulting in November 2018.  According to the Florida Division of Corporations, the business became inactive.  The defendant reinstated the business on June 22, 2020, in order to obtain the PPP loan.  The business had no employees and virtually no income.  Yet, the defendant applied for the PPP loan and claimed that during 2019 Holness Consulting had $120,000 in monthly expenses and a total salary expense for 2019 of $1,440,000.  These were false statements made in order to obtain the PPP loan.

What the defendant did after she obtained the PPP loan proceeds distinguished her actions from many others who fraudulently obtained PPP loans.  First, she induced 22 others to become "employees" of her business.  The defendant issued checks to those individuals and had them endorse the checks and return the checks to her.  She then laundered the proceeds from the PPP loan by cashing the checks, keeping $1,000 and giving approximately $300 to her employees.  The PSI enhances the defendant's sentence by 4 points for being an organizer/leader of a criminal activity involving 5 or more persons. See Section 3B1.1(a) of the Sentencing guidelines.  This

6

criminal activity involved 22 persons. The enhancement for organizer/leader contemplates an organization of criminals and provides a larger sentence for the lead criminal. In this case most of the 22 others who the defendant induced to be part of her criminal activity were not known to be criminals. They were ordinary individuals. One was a school bus driver. Another had a cleaning business. The defendant not only induced but corrupted these individuals by bringing them into her criminal scheme.

As noted above, the defendant is estimated to have obtained approximately $135,000 in cash and approximately $16,000 in checks from the fraudulent scheme. The defendant's conduct is also distinguishable from others in that the defendant dissipated those funds without a trace. The government obtained the bank accounts of the defendant and there is no trace of any of the $135,000 in cash in the bank accounts. Yet, as noted in paragraph 71 of the PSI, the defendant has reported that she has only $2,637 in assets. The defendant has either squandered or squirreled away all of the illegal proceeds. The defendant has never accounted for any of the illegally obtained funds. The defendant has dissipated those funds quickly as the government approached the defendant approximately six months after the last payments were made to her "employees."

Third, the defendant's conduct is also distinguishable from others in that she attempted to obstruct the government's investigation after being approached by the FBI. As noted above, the defendant contacted two individuals and told them to lie to the investigators. One was told to say that the money was earned passing out fliers and making telephone calls and a second was told to tell investigators that he received all of the money reflected in his W-2.

2.    **Seriousness of the offense**

The offense is a serious offense.  While the offense is charged as a wire fraud conspiracy and the victim is a lending institution, this offense is not an ordinary bank fraud.  For the past two years the world has been in the grips of its greatest crisis since World War II.  In order to prevent struggling businesses from laying off their employees and/or going out of business during the international pandemic, the federal government passed the CARES Act.  The defendant saw this as an opportunity to unjustly enrich herself by defrauding the program designed to help those struggling businesses.  Her personal greed and selfishness took away from government funds intended to provide relief to such struggling businesses and employees who desperately needed those funds in order to survive the pandemic.

**The History and Characteristics of the Defendant**

The defendant has set forth in the letters of support written by her friends and associates of the positive aspects of the defendant.  Under 18 U.S.C. § 3553(a)(1) this Court should and will consider those letters.  However, the Court, in assessing the history and characteristics of the defendant, must look at other considerations.

**Defendant Holness Committed This Offense Out of Greed**

The defendant committed this offense out of greed.  There is no other explanation why the defendant would fraudulently obtain the $300,000 loan.   The defendant was not satisfied with just obtaining unemployment benefits.   The defendant also had no qualms about inducing 22 others, including friends and associates to join her fraudulent scheme.  She did not seem to care about the potential consequences to those individuals.

Further, the defendant never stopped participating in the fraudulent scheme.  There were approximately 135 checks over three months where she had the "employees" endorse the checks

which she then cashed.   When first approached by law enforcement, the defendant's initial instinct

was to go to her co-conspirators and tell them to commit another crime by lying on her behalf.   It

also appears that in a relatively short time the defendant has dissipated all the funds and did not

think about maintaining any money to pay back the victim.

.   **Need to Promote Respect for the Law, and Provide**
    **Just Punishment and Afford Adequate Deterrence**

The sentence imposed in this case must promote respect for the law and provide just

punishment.   The sentence must be one that affords an adequate deterrence not only to the

defendant, but others who contemplate committing similar crimes. Thus, 18 U.S.C. §

3553(a)(2)(B) requires a district court to impose a sentence that affords adequate deterrence, both

specific and general. *See United States v. Camiscione,* 591 F.3d 823, 834 (6th Cir.2010)).   General

deterrence comes from a probability of conviction and significant consequences. If either is

eliminated or minimized, the deterrent effect is proportionately minimized.

‼   A district court must therefore consider, and the sentence imposed must reflect, the need

for general deterrence.   The principle of general deterrence is premised on an assumption that

imposing an appropriate sentence will dissuade others from committing similar crimes.   *United*

*States v. Thorpe*, 2018 WL 5322352 (SD Ill Oct. 29, 2018).   "Because economic and fraud-based

crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these

crimes are prime candidates for general deterrence." *United States* v. *Martin,* 455 F.3d 1227, 1240

(11th Cir. 2006) Congress has recognized that general deterrence is particularly important in the

context of white collar crime. See United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006)

("[T]he Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value

of imprisoning serious white collar criminals, even where those criminals might themselves be

unlikely to commit another offense."); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984

U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white- collar crime."). White collar criminals may be particularly susceptible to general deterrence because "[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." See United States v. Sample, 901 F.3d 1196, 1200 (10th Cir. 2018).

### A Guideline Sentence Would Not Create A Sentencing Disparity

A sentence for the defendant within the guideline range would not create a sentencing disparity. The defendant's offense level was computed based on three factors under Section 2B1.1 of the Sentencing Guidelines: a base level of 7; enhancement of 12 due to an actual or intended loss of more than $250,000; and 4 points for the defendant's role as organizer or leader under Section 3B1.1 of the Sentencing Guidelines. Merely looking at the actual or intended loss in other cases does not provide an accurate basis to compare whether a defendant received disparate treatment. For example, in *United States v. Dennes Garcia,* 21-60146-Cr-Altman, Garcia was charged in federal court in Fort Lauderdale with conspiracy to commit wire fraud, bank fraud, and conspiracy to attempt to commit wire fraud and bank fraud for submitting fraudulent loan applications requesting $285,742 in COVID-19 relief funds. Mr. Garcia pled guilty to one count of conspiracy to commit wire fraud, and on October 13, 2021, he was sentenced to 18 months in prison. On its face, it would appear that defendant Garcia received a variance, but he did not. Garcia received a sentence at the low end of the guideline range. The difference between defendant Holness and Garcia was that Garcia was not considered an organizer/leader of the conspiracy.

There were other co-conspirators and Garcia did not get a role adjustment.  Thus, his offense level was a total of 5 levels less. [1]  Also, defendant Garcia agreed to cooperate with the government.

Similarly, in *United States v. Bellamy*, 21-60064-Cr-Altman**,** Joshua Bellamy was charged with conspiracy to commit wire fraud and bank fraud, wire fraud, and bank fraud. The Government alleged that Mr. Bellamy, a former NFL player, worked with several others to submit fraudulent loan applications seeking more than $24 million in COVID-19 relief funds and that Mr. Bellamy obtained $1.2 million as a result. The case was brought in Miami, Florida. On June 9, 2021, Mr. Bellamy pled guilty to one count of conspiracy to commit wire fraud and was subsequently sentenced to 37 months in prison.   On its face, it would appear that defendant Bellamy received a variance, but he did not.  Bellamy received a sentence in the middle of the guideline range 30-37 months.  Like the defendant in *Garcia*, Bellamy was not the organizer/leader and agreed to cooperate against other coconspirators.

There are cases where a Court did grant a downward departure.  For example, in *United States v. Cindi Denton*, 21-60171-Cr-Smith, Cindi Denton was charged with conspiracy to commit wire fraud, wire fraud, bank fraud, and conspiracy to attempt to commit wire fraud and bank fraud. The Government alleged that Ms. Denton submitted fraudulent loan applications for $491,310 in COVID-19 relief funds. Ms. Denton pled guilty to one count of conspiracy to commit wire fraud on July 22, 2021and agreed to cooperate.   Her sentencing guidelines were 18-24 months.  Ms. Denton was sentenced to 6 months in prison and 12 months on home confinement due to her susceptibility to the COVID virus while in prison.

---

[1] Defendant is five levels greater, because she received the four-level adjustment for organizer/leader and her base level was 7 and Garcia's was 6.

Each case is fact specific.   The defendant's sentencing guideline range was higher than the above defendants, because those defendants were not organizer/leaders and agreed to cooperate with the government.   To the contrary, defendant Holness induced and corrupted 22 individuals to participate in her fraudulent scheme.  The defendant also attempted to obstruct the government's investigation.   The defendant did not cooperate with authorities or assist in locate assets for purposes of restitution.   Therefore, a sentence for the defendant within the sentencing guideline range would be an appropriate sentence and one that would not create a sentencing disparity.

### Government's Opposition to the Defendant's Motion for Downward Departure

### The Defendant Did Not Cooperate With Law Enforcement

The defendant claims that she cooperated with law enforcement.  She did not.  Initially when approached by law enforcement, the defendant attempted to obstruct the government's investigation.  The agents then tried to set up two meetings in which she failed to appear.  The agents then tracked her down and served her with a federal grand jury subpoena for records of Holness Consulting.  The defendant obtained counsel and agreed to meet with the government for a "reverse proffer," where the government presented to the defendant and her counsel the government's (overwhelming) evidence against the defendant.  The defendant was then told she had three options; 1) to go to trial; 2) to plead guilty; or 3) to plead guilty and cooperate in the government's investigation.  Counsel for the defendant called a week later stating that her client agreed to plead guilty, but not cooperate.

The defendant claims that she cooperated in that "[S]oon after her interview in this matter, Ms. Holness admitted her involvement in the offenses charged and began cooperating with the Government agents in an effort to mitigate the wrongs she committed." (DE:28)    First, the defendant never agreed to an interview.   The only meeting with the defendant is where the

government provided its evidence to the defendant and her counsel.   Secondly, the only effort to mitigate her wrongs was by her agreeing to plead guilty.   For her agreement to plead guilty the government agreed that the defendant should receive three points for acceptance of responsibility. The Court could also impose a sentence at the low end of the guideline range.  The defendant's agreement to plead guilty is not worthy of a departure, especially in light of the defendant's attempt to attempt obstruct the investigation and her failure to preserve any assets for restitution.

It is also important to note that when the government met with the defendant and her counsel, the government provided an estimate of the Sentencing Guidelines if the defendant wanted to proceed to trial.  The government was prepared to charge money laundering as the defendant issued checks from the proceeds of the fraudulently obtained funds, cashed the checks, and secreted the funds.  By charging money laundering the defendant's guideline range would have been increased by two levels.   The government would also have pursued the two-level enhancement for obstruction of justice.  The defendant's guideline range would have been 51-63 months, even with the defendant receiving 3 points for acceptance of responsibility.   The government agreed to forego the money laundering charge and has not objected to the failure to include an enhancement for obstruction in the PSI, because of its belief that a sentence within the guideline range of 33-41 months was reasonable.  The government does not believe that a further reduction is warranted.

The defendant also claims that she assisted the government by providing bank records to the government.  The bank records were turned over pursuant to a federal grand jury subpoena to Holness Consulting.  The defendant did not cooperate with the government by turning over those records.

**The Defendant's Family Circumstances Are Not a Basis for a Downward Departure**

The defendant requests a downward departure due to her family circumstance, that is, on October 3, 2020, the defendant gave birth to a daughter who is now 15 months old. The defendant's motion states that the defendant is the primary caretaker for the child and seeks a downward departure claiming that her imprisonment will cause irreparable harm to the child. The defendant's motion should be denied.

In many, if not most of the cases where a defendant is sentenced to incarceration, such incarceration causes a hardship on the family. In a recent sentence a defendant claimed as a basis for a downward departure that he was the sole caretaker of his 99 year-old infirm father. The departure request was denied. Other defendants have requested a departure claiming that they are caretakers for family members who have cancer, lupus, or other serious illness. Others claim, like the defendant in this case, claim that they are needed to provide for young children.

First, in this case it is difficult to accept the defendant's request as a basis for a departure as the defendant committed the charged offense during the seven month through her ninth month of pregnancy. She obtained the fraudulent loan proceeds on July 2, 2020, and began issuing and then cashing the checks from July 2020 through September 2020. The defendant was well aware that she was giving birth and that if she was caught that she could go to jail. The defendant decided to continue with the fraudulent scheme. She could have returned the loan proceeds or preserved the funds in order to pay all or a portion back to the bank. But the defendant did neither. Thus, it is hard to see how an departure would be appropriate given that, immediately prior to the child's birth, the defendant made a conscious decision to continue on with the fraud, knowing that she could potentially be incarcerated.

There are numerous cases that support the government's position. In *United States v. Sweeting*, 213 F.3d 95 (3d Cir. 2000), the defendant was convicted of distribution and possession with an intent to distribute cocaine. The defendant filed a motion for downward departure alleging three grounds, one of which was extraordinary family ties. Defendant stated she was the sole support for her five children, one of whom was suffered with Tourette's syndrome. The trial court found that the case "presented extraordinary circumstances because 'Ms. Sweeting is a single parent providing for five children, one of whom has a substantial neurological deficit in the form of Tourette's Syndrome.'" The trial court then departed 12 levels down, which resulted in an adjusted offense level of six, with a Guideline range of 6 – 12 months imprisonment and sentenced the defendant to five years of probation and the government appealed. The Third Circuit reversed. The Third Circuit stated in its opinion that:

> [A]s our cases repeatedly have recognized, the circumstance that Sweeting's incarceration will disrupt the family unit cannot be considered atypical, inasmuch as the innumerable defendants no doubt could establish that their absence will cause a void un their children's lives. As a practical matter, it may be said that most children look to their parents for support, guidance and stability. But, as we indicated in *United States v. Gaskill*, 991 F.2d 82 (3d Cir. 1993), "[d]isruptions of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration. Disintegration of family life in most cases is not enough to warrant departures."

The Court in *Sweeting* cited the Fourth Circuit decision in *United States v. Brand*, 907 F.2d 31, 33 (4th Cir.1990), which denied a motion for downward departure based on family circumstances and stated that:

> A sole, custodial parent is not a rarity in today's society, and imprisoning such a parent will by definition separate the parent from the children. It is apparent that in many cases, the other parent may be unwilling or unable to care for the children, and that the children will have to live with friends, relatives or even in foster homes.... [Defendant's] situation, though unfortunate, is simply not out of the ordinary.
> !

In *United States v. Headley*, 923 F.2d 1079, Headley was a single mother of five children, ranging in age from 11 months to 11 years who was convicted of charges stemming from her activities as a drug courier for a large narcotics manufacturing and distribution organization. She had a relationship with the leader of the drug organization in which she participated, and it was undisputed that he was the father of her five children. Headley argued in the district court for a downward departure for extraordinary family responsibilities under **section 5H1.6**, but the court held that it lacked authority to depart downward from the applicable Guidelines range on that basis. The district court thus sentenced Headley to 17 years imprisonment, the minimum in her Guidelines range. *See id.* at 1081-82. Headley appealed, arguing that the district court erred in concluding that it lacked authority to consider the psychological impact that a lengthy sentence would have on her five young children. The Third Circuit rejected her argument, despite the fact that Headley's situation was unfortunate, holding that incarceration of a single parent and its concomitant effects on the children simply cannot be characterized as out of the ordinary. S*ee also United States v. Leandre*, 132 F.3d 796, 807-08 (D.C.Cir.1998) (affirming district court's denial of the defendant's request for downward departure under section 5H1.6 based on fact that he was a single father of two young children who might be placed in foster care as a result of incarceration; court of appeals stated that "[f]rom the perspective of the defendant's children, the result may be harsh but it is not so extraordinary a circumstance confronting sentencing judges"); and *United States v. Chestna,* 962 F.2d 103, 107 (1st Cir.1992) (request for downward departure denied for defendant who was single mother of four young children, one of whom was born after sentencing); *But see United States v. Johnson*, 964 F.2d 124, 129 (2d Cir.1992).

In *United States v. Cacho*, 951 F. 2d 308 (11th Cir. 1992) the defendant pled guilty to conspiracy to import cocaine.  At sentencing the defendant requested a downward departure as she

was the mother of four small children.  The Eleventh Circuit affirm the lower court's refusal to grant such a request.  The Eleventh Circuit stated in its opinion that the defendant:

"has shown nothing more than that which innumerable defendants could no doubt establish: namely, that the imposition of prison sentences normally disrupts ... parental relationships." *United States v. Daly,* 883 F.2d 313, 319 (4th Cir.1989), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2622, 110 L.Ed.2d 643 (1990).

The defendant's motion states that she is the primary caretaker of her daughter, not her sole caretaker.  From the letters filed in support, it appears that the defendant has a good support system who will look after her child.  Therefore, there is no basis to grant a downward departure or variance on this basis.

## Conclusion

For the reasons set forth above, the government requests the defendant's request for downward departure be denied and that the defendant be sentenced within the guideline range of 33-41 months.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY
By: S/Jeffrey Kaplan
JEFFREY N. KAPLAN
Assistant United States Attorney
Court ID No. 5500030
500 E. Broward, Seventh Floor
Fort Lauderdale, Florida 33394
Tel: (954) 660-5695
Fax: (954) 356-7230
Email: Jeffrey.kaplan@usdoj.gov

17

<u>**CERTIFICATE OF SERVICE**</u>

      I HEREBY CERTIFY that on January 30, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and thereby serve the foregoing document on counsel of record.

                               _s/Jeffrey Kaplan_____

                               JEFFREY N. KAPLAN

                               Assistant United States Attorney

!       !!

       !